THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES of AMERICA *ex rel.*       C.A. No. 8:07-CV-02374-JDW-TBM
SAMUEL L. ARMFIELD, III, M.D. and
PATRICIA ARMFIELD, R.N.,

            Plaintiffs,

    v.

JAMES P. GILLS, M.D.; ST. LUKE'S
CATARACT AND LASER INSTITUTE;
and ST. LUKE'S SURGICAL CENTER,

            Defendants.

**PLAINTIFFS' MOTION TO FILE A THIRD AMENDED COMPLAINT**

1.     The Plaintiffs seek an order allowing them to file a Third Amended Complaint.

The proposed Third Amended Complaint (a copy of which is attached hereto as

**Exhibit 1**) does not allege any new Counts or causes of action and does not

propose to add new parties.  However, it seeks to clarify certain aspects of the

claims Plaintiffs have asserted in Counts II, III and IV of Plaintiffs' Corrected

Second Amended Complaint (hereinafter "CSAC").  As such, it is well within the

ambit of the types of amendments to pleadings which should be liberally granted.

2.     There is a vital reason for the Court to grant this motion.  In his May 27, 2010

deposition, James P Gills, Jr., M.D. essentially admitted to a pattern of false

billing in connection with his use of the CPT code 66825 to seek payment for the

procedure he styles as "rotation" of toric intraocular lenses, the subject of Count

II of Plaintiffs' complaint.  Gills admitted that the rotation procedure is performed

1

to correct for refractive error, a service for which, as Gills himself readily admitted during his deposition, Medicare does not pay. The fraud is palpable. Gills conceals it by falsely representing to Medicare that he performs a different procedure entirely: intraocular lens repositioning, which is described by CPT code 66825. Gills and his son, James Pitzer Gills, III, M.D., have billed lens rotation procedures approximately 2,900 times since September 2002—and quite curiously, no earlier than that—for amounts ranging from $650 to $1,636 for each procedure.

3.      The outrageousness of the scheme can best be appreciated when one considers that Gills has now filed a summary judgment motion in which he ostensibly relies on the declaration of Kevin Corcoran, a prominent figure in Medicare coding circles, to argue, rhetorically, that the language of the CPT code 66825 encompasses a "rotation." However, in his widely published statements outside of court, Corcoran has acknowledged that the semantics of rotation vs. repositioning is beside the point, because refractive surgery, such as that conducted by Gills, is not reimbursable.[1] In other words, the Defendants pursue an argument in their summary judgment motion which relies on their deliberate omission of the purpose for the procedures whose billings they seek to justify. The omission is material, and is meant to thwart the fact finding in this case.

---

[1] Discussed below are Corcoran's published statements on the issue, which stand in stark contrast to his declaration. As will be shown, a PowerPoint presentation by Corcoran, available on the Internet, specifically disavows that lens rotations performed to correct for refractive error are reimbursable. However, rather than share this information with the Court, Defendants have instead elected instead to mount a highly technical defense.

4.      While this will be Plaintiffs' third amended complaint, a number of factors militate

in favor of the amendment:

- First, if the amendment is not allowed, Gills may elude the penalty for his fraud. Justice is the first goal of the federal rules. Now that Gills' fraud has been uncovered, justice demands that he not be allowed to freely continue to present false claims to the United States of America.

- Second, the amendment will not prejudice Gills, because it constitutes only a minor modification of Plaintiffs' legal theories. Plaintiffs have always contended that Defendants' billing for toric lens rotations was fraudulent and that Gills did not perform lens repositioning. The amendment does not alter that position. It supplements Plaintiffs' existing theory with the additional fact that Gills uses the CPT code to conceal a further illicit purpose. The proposed amendment merely articulates a different reason for the conclusion that the billing is illegal. No substantially new factual discovery will be required, nor will the Defendants be placed any jeopardy of additional litigation costs or expenses.

- Third, the Plaintiffs are seeking the amendment in a timely fashion. Gills only admitted the fraud three weeks ago, during his May 27, 2010 deposition. Until that time, he used his attorneys to conceal the fraudulent practice, and cloud it in rhetoric, similar to the approach taken by Corcoran in his declaration, in which the latter obscured the practice in an effort to justify the billing. In other words, the fraud was latent and not patent. Additionally, Gills' medical records contained false information to justify the nonreimbursable procedure.

5.      The importance of this matter cannot be overstated. Information has been

discovered which shows that Gills' coding consultant, Corcoran, has advised

Gills to conduct the toric lens procedures in the Surgical Center, so that a facility

charge can be appended to the already exorbitant charge for the procedure.

Flaunting his contempt for this case and the law itself, Gills testified that he

intended to do just as Corcoran had (purportedly) advised, thus increasing his

billing to the United States of America for procedures that Gills knows are not

reimbursable, by scheduling them in the Surgical Center and then awaiting the

receipt of facility fees in addition to the illegal physician fees he continues to collect to this day.[2] Gills' taunts continued as he credited Plaintiffs for inspiring his decision to shift the procedures from a less expensive treatment setting to one that was more costly, referencing the Surgical Center's minor procedure room and asserting "we're going to start using it more in the Center for the economic reasons that you've brought out to us." (Deposition of James P. Gills, Jr., M.D. ("Depo. JPG") at 158)**(Exhibit 2)**. When asked the reason for such a change in practice, and whether it had to do with being able to bill more for the procedure, Gills proclaimed that "that would be a reason if our reimbursements continue to go down as they have . . . Consultants have simply told us . . . that they suggested we do it exactly what you said; and they suggested it for the exact reason you suggested it . . . *Maybe we should have used your suggestions earlier.*" (Depo. JPG at 158-159)(emphasis added). If this Court were to deny the amendment, Gills could easily perceive that he had been given a green light to not only continue in his false billings, but to increase them. This Court should not allow a party to practice a fraud on it and on the government, and the amendment should therefore be allowed.

---

[2]Gills acknowledged this advice in his deposition and mused that he "might very well [start performing the procedure in the Surgical Center since] [t]here is not a facility charge when it's done in the outpatient surgery—there is when it's done in the facility." (Deposition of James P. Gills, Jr., M.D. at 133).

**THE COUNT II AMENDMENTS ARE WARRANTED BASED ON EVIDENCE
FURNISHED BY DEFENDANTS DURING FACT DISCOVERY**

6.       The issue addressed in Count II of the CSAC involves Gills' billing under the repositioning code, 66825, for procedures that were not, as that code specifies, a "Repositioning of intraocular lens prosthesis, requiring an incision (separate procedure)."  A repositioning of an intraocular ("IOL") lens is only necessitated in the rare instance that the lens becomes dislocated.  Dr. Gills admitted in his deposition that the incidence of IOLs falling out of position or becoming dislocated is quite low, occurring in 1 in 300 cases.  (Depo. JPG at 18).  However, in nearly 2,900 instances since September 2002—out of fewer than 58,000 IOL implantations overall—Gills and the Defendants have billed and received reimbursements from Medicare for these procedures.  This ratio alone suggests that the IOLs of Defendants' patients dislocate at fifty times the rate that Gills described.  The Defendants' rate of false billing becomes more arresting when one considers that toric lenses are not implanted in every case.  The CSAC alleges that Gills' practice of billing the United States of America under CPT Code 66825 was "to maximize billings."  (CSAC ¶ 75).  The CSAC also alleges that Gills "did not perform a lens repositioning on Dr. Armfield." (CSAC ¶ 79).[3]

_____

[3]The CSAC alleges that "at no time prior to the lens rotation procedure had Dr. Armfield's lens migrated to another area of his eye.  Instead, the lens was in its proper position and only required that it be rotated in its current position." (CSAC ¶ 80).  As noted at ¶ 67 of the CSAC, the properties of toric lenses are such that "when rotated about the central visual access, they produce a change in visual acuity."

7.	Gills has now admitted that his billing for toric lens rotation procedures, which he submits under the IOL repositioning code, has defrauded the government. Gills' lens rotation procedures do not constitute lens repositionings under CPT code 66825. During discovery, it was revealed that Gills has improperly used 66825 to conceal from an unwitting Medicare the fact that he is performing a procedure that is not properly billed under any circumstance, because its only purpose is to cure pre-existing astigmatism. Medicare, as Gills well knows, prohibits reimbursement for surgical services that are undertaken as a substitute to the wearing of eyeglasses. As will be discussed below, there can be no valid argument that refractive surgery is reimbursable under Medicare law.

8.	During his May 27, 2010 deposition, Gills acknowledged that the true purpose of the toric lens rotation procedure was to correct preexisting astigmatism, so that his patients need not wear glasses:

> Q	Okay. So, now, is the procedure that you used to – that involves rotation of the toric lens, is that to – is that a claim for a refractive surgery to correct preexisting astigmatism?
>
> *	*	*
>
> A	Yeah. The toric lens is used correct preexisting astigmatism.
>
> Q	And the rotation of the toric lens is used to correct preexisting astigmatism after the initial cataract surgery. Is that right?
>
> A	Yes, sir.

(Depo. JPG at 169-70). Gills further acknowledged that he billed Medicare for

these treatments.[4]

> Q    Now – and these procedures that you rotate the eye are essentially designed to correct astigmatism.  Is that right.
>
> A    That is correct.
>
> Q    But you do bill Medicare for those procedures?
>
> A    Absolutely.

(Depo. JPG at 162-63).  Gills also admitted in his deposition that he knew that the procedures billed for were not reimbursable:[5]

---

[4]It is just as clear that these procedures are not undertaken to correct for iatrogenic (i.e., surgically-induced) astigmatism, but rather to treat the patient's residual astigmatism, i.e., that portion of the patient's pre-operative astigmatism that remains following cataract surgery:

> Q    Now, the astigmatism that we've been talking about relative to rotation of the toric lens is no – we haven't seen any files where that's iatrogenic astigmatism, have we?
>
> A    No, we have not.
>
> Q    Is that – iatrogenic astigmatism, is that a rare occurrence now?
>
> A    It wasn't until we started doing phacoemulsification.  It was very common before.  Since phacoemulsification there's about .3 diopter, which isn't significant, but we figure in the formulas.

(Depo. JPG at 168).

[5]Medicare prohibits reimbursement for any such procedure performed on a patient with a conventional IOL on the basis that it would be neither medically reasonable nor medically necessary.  Social Security Act, Title XVIII, § 1862(a)(1)(A), 42 U.S.C. § 1395y(a)(1)(A)(". . . [N]o payment may be made under Part A or Part B for any expenses incurred for items or services . . . . [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.").  Services to correct for residual refractive error or astigmatism are "considered a substitute or alternative to eye glasses or contact lenses, which are specifically excluded by § 1862(a)(7) of the Act."  Medicare Coverage Issues Manual, Health Care Financing Administration, Department of Health and Human Services, Transmittal 131, November 22, 2000, § 35-54. **(Exhibit 3)**.  In addition, in a ruling from January 2007 CMS stated that, "Medicare does not cover the surgical

Q. Okay. Well, you must have known whether these procedures that you were performing over the years were covered by Medicare.

A. That's correct.

Q. You knew that. Right? Were they covered by Medicare or not covered by Medicare?

A. They probably were not.

(Depo. JPG at 116). Since, by Gills' own admission, the purpose of the post-operative procedure involving the rotation of toric lenses was to correct for pre-existing astigmatism, the billings he submitted for these procedures were false. Gills' deposition testimony demonstrates that he was involved in knowingly submitting false claims for these procedures.

9. In a report which he has furnished to Plaintiffs, Alan S. Lane, M.D., a Florida ophthalmologist with 36 years of board-certified experience, explains why lens rotations do not constitute lens repositionings:

> As to Dr. Gills "repositioning" of Dr. Armfield's toric IOL, he clearly states in his operative report that he rotated the implant to the correct axis with a 30 gauge needle through the original incision . . . Obviously, this rotation of the toric implant is to correct a refractive problem, rather than a lens that is dislocated or out of position, as procedure code 66825 describes. That code describes a repositioning of an intraocular lens implant . . . This

---

correction . . . that may be required to compensate for the imperfect curvature of the cornea." CMS 1536-R, at 5. **(Exhibit 4)**; see also, Instructions for Implementation of CMS 1536-R, Astigmatism-Correcting Intraocular Lens CMS Manual System, Transmittal 1228, Pub 100-04, Medicare Claims Processing, Centers for Medicare and Medicaid Services, Department of Health and Human Services, April 27, 2007, at 6 ("There is no Medicare benefit category that allows payment of physician [or facility] charges for subsequent treatments, services and supplies required to examine and monitor the beneficiary who receives an astigmatism-correcting IOL following removal of a cataract that exceed the facility charges for subsequent treatments, services, and supplies required to examine and monitor a beneficiary after cataract surgery followed by insertion of a conventional IOL.)**(Exhibit 11)**.

procedure code was initiated may years before toric lenses were designed. It is intended to be used in situations when an "any type of IOL" needs to be repositioned surgically, because of subluxation, haptic displacements or traumatic injury to the IOL. Clearly Dr. Gills in fact does not perform a separate procedure, but instead merely performs a rotation of the toric lens with a needle under topical anesthesia in a minor surgery room and not the OR.

**(Exhibit 5)**.

## THE COUNT III AMENDMENTS ARE WARRANTED BASED ON EVIDENCE FURNISHED BY DEFENDANTS DURING FACT DISCOVERY AND IN REBUTTAL TO DEFENDANTS' THEORY REGARDING THE ALLEGATIONS AT COUNT III OF THE CSAC

10.    In Count III of the CSAC, Plaintiffs alleged that Defendants contrived a scheme in which they falsely billed the United States of America for evaluation and management ("E&M") services of lens rotation patients during the 90-day global surgery period following C/IOLI surgery, for which no reimbursement is allowed.

11.    However, during discovery, Defendants asserted in rebuttal to Plaintiffs' Count III theory that the E&M service conducted on Samuel Armfield the day before his lens rotation procedure was not related to the lens rotation procedure, but instead represented an encounter with Gills in which: (1) Armfield's left eye was examined in preparation for C/IOLI surgery; and (2) Gills "devised" the plan to perform the second C/IOLI.

12.    Defendant's rebuttal theory is fallacious. Armfield's April 22, 2005 medical chart refers to the fact that the left-eye surgery had already been scheduled as of that date. (SLCLI 00045)("SS/OS Friday JPG", as translated, "Schedule Surgery/Oculus Sinister [left eye], Friday, James P. Gills.")**(Exhibit 6)**.[6]

─────────────────────

[6] The Friday following April 22nd was April 29, 2005.

9

Additionally, Armfield's medical chart demonstrates that on April 22, 2005, he was fitted for toric lenses for both eyes. (SLCLI 00054-00057)**(Id.)**.  Furthermore, Defendants have produced a chart note dated April 27, 2005 (on a day that Armfield called to complain of post-operative blurred vision in his right eye), in which Armfield is quoted as saying that he wanted to discuss the right eye problem with someone, as he was scheduled for C/IOL surgery on his left eye on April 29, 2005.  Chart note, April 27, 2005, "Medical Question", Billie Donaldson. (**Id**. at SLCLI 00042).  For his part, Armfield testified that when he first presented to St. Luke's Cataract and Laser Institute on March 29, 2005, he underwent a comprehensive eye examination which disclosed that he had mature cataracts in both eyes. (Deposition of Samuel L. Armfield, III, M.D. at 37-38) **(Exhibit 7)**.

13.  Nonetheless, during his testimony, Gills denied that he had made the decision to perform C/IOL surgery on Armfield's left eye by April 22, 2005:

> Q.   Okay.  So the – do you know if you made the – when you did the examination on the eyes on April 22nd, did you make the determination that there was going to be bilateral surgery?
>
> A.   No.  We make one –
>
> *   *   *
>
> MR. OLDS:  Could you repeat that last question again, because maybe I did ask it wrong.  But if you could repeat it again.
>
> THE COURT REPORTER:  "Question:  So do you know – when you did the examination on the eyes on April 22nd, did you make the determination that there was going to be a bilateral surgery?"
>
> A.   I did not make that determination at that date.

(Depo. JPG at 189-90).

14.     After Gills' deposition, Plaintiffs re-examined the sample patient files provided by Defendants. Based on a comparison of this evidence, along with the electronic records provided by First Coast, Plaintiffs discovered multiple cases in which Defendants submitted billing for eye examination services which were rendered: (1) after first-eye C/IOL surgery, and thus, after the Defendants had already rendered and billed for a comprehensive bilateral eye examination; and (2) just prior to C/IOL surgery on the patient's second eye.

15.     As described in Plaintiffs' Proposed Third Amended Complaint, Defendants disguised the second examinations as generic E&M services, rather than as services that were specifically ophthalmic in nature. Defendants did this to preempt any rejection of their claims, which would likely have occurred had Defendants submitted a second claim for specifically ophthalmic E&M services within the month following a comprehensive bilateral eye exam—in such an instance, the Medicare carrier would have had reason to reject the claim as duplicative of the E&M services rendered only weeks before.

16.     Thus, in cases similar to Armfield's, in which patients returned for lens rotation procedures, as well as in cases in which patients returned for C/IOLI surgery without lens rotation, Defendants pursued the same illegal strategy: they devised schemes to ensure that they would receive a wallet enhancement, by billing for subsequent eye examinations that would not result in reimbursement unless submitted under a disguise. If the examinations were intended to address problems in the eye that had already undergone toric lens implantation, reimbursement was barred by the Global Surgical Package rule. In contrast, if

11

they were intended as a precursor to C/IOL on the patient's second eye, they were redundant, because an earlier comprehensive and bilateral examination had already been performed.  In other words, the examinations lacked any medically reasonable or necessary basis.  Accordingly, to render these examinations reimbursable, Defendants variously disguised them as E&M services for surgical decision making unrelated to the patient's prior C/IOL surgery, or as non-ophthalmic in nature.

17.     Based on records produced by First Coast, the Defendants have billed the United States of America for these nonreimbursable examinations in at least 13,854, and as many as 19,918 instances, if not more.

18.     During his deposition, Gills acknowledge that it is his standard practice to perform, and then bill for, a second eye examination following the initial comprehensive exam, typically on the day that the patient returns to the Surgical Center for C/IOL surgery on the second eye:

> Q.     Okay.  So what you're saying is – well, I guess I want to understand whether you have a – is there a protocol that a patient will always come in for a second examination before the second cataract surgery is done?
>
> A.     That's correct; and that has basically been – our consultants tell us exactly what to do and how to do it.
>
> Q.     Okay.  And so even though all of the testing was done in connection with the first procedure – because you – on April 22nd you tested for both the right lens and the left lens –
>
> A.     Yes, sir, that's correct.
>
> Q.     – you did all that.  The patient comes back for a second examination to determine whether there's going to be a surgery on the second eye?

A.    That's correct.

(Depo. JPG at 190-91).  Here, Gills wildly contradicts himself.  He asserts that his patients routinely return to St. Luke's on their appointed surgery dates, in the absence of a decision to perform surgery on that date.

19.    Plaintiffs' original theory as to the false nature of the billing for Armfield's April 28, 2005 eye examination is stated in detailed fashion in the CSAC, and need not be rehashed here.  But as was the case with Defendants' billing for the toric lens procedures, the facts supporting this supplemental false claims theory have only recently been discovered.  Once again, it must be recalled that the Defendants refused to provide any documents, even Dr. Armfield's Surgical Center files, until late February 2010—six months after the Plaintiffs had first sought this information.  Prior to being named as an additional Defendant, the Surgical Center even went so far as to resist the Plaintiffs' subpoena for this evidence.  After Plaintiffs were forced to file serial motions to compel, and the Court required Defendants to begin turning over documents, discovery has proceeded, although much evidence still remains to be gathered.  In the meantime, Plaintiffs have diligently pursued discovery and now, by this motion, seek to promptly incorporate this new evidence into their case.

**THE COUNT IV AMENDMENTS ARE WARRANTED BASED ON EVIDENCE FURNISHED BY DEFENDANTS DURING FACT DISCOVERY WHICH CANNOT BE FULLY DISCLOSED IN THIS PLEADING, GIVEN DEFENDANTS' INSISTENCE THAT EVIDENCE REGARDING THE CONTRACTUAL AND REFERRAL RELATIONSHIPS BETWEEN DEFENDANTS AND STEPHANIE DEVERICK, M.D. CONSTITUTES CONFIDENTIAL PROPRIETARY INFORMATION**

20.	In Count IV of the CSAC, Plaintiffs alleged a referral scheme between Defendants and Stephanie Deverick, M.D., one which relied on a leasing arrangement between these parties that was in violation of anti-kickback law.

21.	Plaintiffs have amended their Count IV averments based on documentary evidence produced by Defendants during discovery regarding, inter alia, contractual and referral relationships between Defendants and Deverick (hereafter, "Deverick materials").

22.	However, in producing this evidence, Defendants exercised unilateral powers provided by the standing protective order regarding the release of proprietary information.  See, Protective Order, ¶¶3; 5 (Doc. 97-1).  Specifically, Defendants marked each of the Deverick materials "Produced subject to Protective Order", thereby insisting that any documents evidencing Deverick's contractual and referral arrangements with Defendants constituted "confidential proprietary information, the release of which may cause or threaten to cause business injury to the St. Luke's entities."  See, Protective Order, at 1.

23.	In any event, given Defendants' designations, Plaintiffs have redacted those portions of their amended Count IV averments which discuss the Deverick materials.

24.	Plaintiffs are currently subject to a deadline of June 21, 2010 for the filing under seal of a supplemental response addressing the question of whether "leave to amend should be granted if or to the extent that the Court were to grant Defendants' motion to dismiss Counts III and IV of the CSAC."  Plaintiffs will use

that opportunity to present the Court with a summary analysis of the Deverick materials.

## STANDARDS FOR GRANTING THE MOTION TO AMEND

25. Motions to amend are governed by Rule 15(a) of the Federal Rules of Civil

Procedure, which provides that "leave [to amend a party's pleading] shall be

freely given when justice so requires." In defining the scope of Rule 15(a), the

Supreme Court has explained that:

> [I]n the absence of any apparent or declared reason—such as undue
> delay, bad faith or dilatory motive on the part of the movant, repeated
> failure to cure deficiencies by amendments previously allowed, undue
> prejudice to the opposing party by virtue of allowance of the amendment,
> futility of amendment, etc.—the leave sought should, as the rules require,
> be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). See also *Jameson v. Arrow Co.*, 75

F.3d 1528, 1534-35 (11th Cir.1996); *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d

754, 761 (11th Cir.1995)("If the underlying facts or circumstances relied upon by

a plaintiff may be a proper subject of relief, he ought to be afforded an

opportunity to test his claim on the merits.").  The policy of Rule 15(a) espouses

liberal allowance to amend. *Espey v. Wainwright*, 734 F.2d 748, 750 (11th

Cir.1984)("unless there is a substantial reason to deny leave to amend, the

discretion of the district court is not broad enough to permit denial"). Because of

the policy which favors liberal allowance to amend, a "substantial reason" must

exist for the Court to deny the motion. *Id.* at 750*. Boyce v. Augusta-Richmond

County,* 111 F.Supp.2d 1363 (S.D.Ga. 2000.)  See *Nevels v. Ford Motor Co.,*

439 F.2d 251, 257 (5th Cir.1971)(leave to file amendments should generally be

freely given; however "amendments should be tendered no later than the time of

pretrial unless compelling reasons why this could not have been done are presented"); accord, *Hargett*, 60 F.3d at 761.

## THE PROPOSED AMENDMENT NEITHER CONSTITUTES NOR RAISES AN ISSUE REGARDING UNDUE DELAY, PREJUDICE TO THE DEFENDANTS, OR FUTILITY

### Absence of undue delay

26.     While proposed amendments that are unduly delayed may be denied, "*only undue delay forecloses amendment, which can be appropriate as late as trial or after trial.*" *Collins v. International Dairy Queen*, 190 F.R.D. 633, 635 (M.D.Ga. 2000), *citing*, *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir.1981)(emphasis supplied). The record of Plaintiffs' diligence in this case cannot be contested, although Defendants' willingness to comply with their discovery obligations can. Plaintiffs served their discovery promptly after the case management conference, but waited more than five months—until late February 2010—to receive any documentary evidence regarding Defendants' practices as to patients other than Samuel Armfield, and only succeeded in receiving that evidence after filing numerous motions to compel.[7] Thus, Plaintiffs present this motion only four months from the date that the Defendants began providing information about their medical and billing practices.

27.     This Motion is also being filed less than three weeks after Dr. Gills' deposition, which occurred on May 27, 2010, and within days of Plaintiffs receiving the

---

[7]See, **Plaintiffs' Motion to Compel Answers to Interrogatories**, (Doc. 62); **Plaintiffs' Motion to Compel Defendants to Comply with FRC 26(a) Disclosure Obligations** (Doc. 63); and **Plaintiffs' Motion to Compel Production of Documents** (Doc. 69).

transcript of that proceeding. It was in that deposition that Gills admitted for the first time on this record that the purpose of the toric lens rotation was to correct pre-existing astigmatism, a service which he knew was not reimbursable under Medicare. Those admissions stand in stark contrast to the contents of his medical and billing records, which make no mention of treating pre-existing astigmatism.[8]

28.     Given the fact that Plaintiffs have diligently pursued discovery and promptly presented the Motion to Amend, it would be an abuse of discretion for the court to deny the motion. *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 391 (5th Cir. 1985)("Auster sought the amendment just six months after it filed this action, it had diligently sought discovery in both state court and these proceedings, and it asked for amendment promptly upon discovering the basis for new allegations. Appellees thus cannot claim prejudice due to untimeliness of Auster's motion or any delay it might cause."). See also, *Spartan Grain & Mill Co. v. Ayers*, 517 F.2d 214, 220 (5th Cir. 1975), *citing, Applied Data Processing, Inc. v. Burroughs Corp.*, 58 F.R.D. 149 (D.Conn. 1973)("The mere passage of time [sixteen

---

[8]Thus, the perioperative reports, diagnostic reports and billing information, which were provided to the Plaintiffs in February of this year (in response to discovery requests served six months earlier) implied legitimate bases for the procedures. Plaintiffs' complaint questioned whether the procedure performed matched the CPT code used to justify the billing, but the records purport to justify the procedure by stating such diagnoses as "mechanical failure of implant" in most cases. However, Gills readily acknowledged during his deposition that the procedure was performed to render his patients free from eyeglasses. (Depo. JPG at 123-24).

months] between an original filing and an attempted amendment is not a sufficient reason for denial of the motion.") [9]

## **Absence of Prejudice to the Defendants**

29.  Defendant will suffer no legal prejudice from a determination that Plaintiffs should be permitted to amend their complaint.  Legal prejudice is present where a party's actual legal rights are threatened or "where monetary or other burdens appear to be extreme or unreasonable." *Green Giant Co. v. M/V Fortune Star*, 92 F.R.D. 746, 748 (S.D.Ga.1981).  There is no such prejudice occasioned by Plaintiffs' motion to amend.  Fact discovery has yet to conclude, and Plaintiffs recently moved for an enlargement of time to file expert reports.  In light of the latter motion, Defendants withheld their own expert reports.  The Court has set the summary judgment cut-off date for August 23, 2010.  The Defendants have filed their Motion for Summary Judgment prematurely.  Discovery is still ongoing and Plaintiffs intend to file a Response to the Defendants' Summary Judgment Motion.  However, the granting of this Motion would not substantially affect discovery, and to the extent that the Defendants wish to amend their Summary Judgment Motion to respond to these allegations or to conduct other discovery, the Court could condition this Order granting the amendment upon whatever conditions the Defendants need.

---

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

30.     Plaintiffs' proposed amendment should be granted, because it does no more
        than supplement Plaintiffs' existing legal theories, and neither introduces an
        entirely new claim, nor even any new facts that would require extensive
        discovery.  *Gropp v. United Airlines, Inc.*, 847 F.Supp. 941, 945 (M.D. Fla 1994)
        ("A change of the legal theory of the action cannot be accepted as the test of the
        propriety of a proposed amendment. *Green v. Walsh*, 21 F.R.D. 15, 19 (E.D.Wis.
        1957)("Plaintiffs do not propose a new suit, nor do they rely on other facts.
        Instead, Plaintiffs are merely presenting to the Court another theory or cause of
        action which may exist under the facts.")   Also militating in favor of granting the
        motion is the fact that Plaintiffs seek to add no new cause of action, but merely
        seek to clarify the claims that have already been brought. *Id*.  ("That Auster
        endeavored chiefly to correct any flaws in its original statement of its claims and
        did not seek to allege new causes of action also cuts in favor of holding that
        justice requires allowing the amendment. See *Daly [v Sprague]*, 742 F.2d [896]
        at 900 n. 6 [5[th] Cir. 1984] (stating that appropriateness of amendment depends in
        part on "the germaneness of the subject matter of the amendment to the subject
        matter of the suit").") *Auster,* Supra 764 F2d  at 391-392.  Insofar as the toric
        lens procedure goes, the amendments merely asserts that the purpose of the
        procedure–correction of pre-existing astigmatism–renders any claim for
        reimbursement fraudulent.

## The proposed amendment is not futile

31.   The singular test for futility turns on whether the "[proposed amendment] could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420-21 (6th Cir. 2000). Despite Defendants' obstructionist tactics, Plaintiffs have amassed significant evidence in support of their contentions that Defendants' entire enterprise is suffused with fraud. In their proposed amendment, Plaintiffs have noted, in painstaking detail, the breadth and contours of Defendants' practices regarding false billing, which Defendants pursued through knowing misrepresentation of the surgical and E&M services they provided. By his own words, Gills has acknowledged that the lens rotations he performed were refractive in nature, and that Medicare would not pay. He billed anyway.

32.   The flippancy with which Gills has approached this case is illustrative of the Defendants' wholesale contempt for the law. Indeed, they went to great lengths to conceal and disguise their work, by submitting bills, in tens of thousands of instances, in which the CPT codes falsely represented the services rendered.

33.   Defendants' actions were neither accidental, nor inadvertent, and instead reveal a careful and methodical approach to bilking the United States of America. Defendants could not have pursued a fraudulent enterprise of this scope and magnitude in the absence of Gills' prerogative in directing the numerous staff under his command to do his bidding.

34.   In *U.S. ex rel. Longest v. Dyncorp*, 2006 Westlaw 47791 (M.D.Fl. 2006)(Presnell, J.), this Court held that a plaintiff could satisfy Rule 9(b)'s particularity

21

requirement upon a demonstration of particularity as to at least some of the several fraudulent schemes alleged. Plaintiffs' proposed amendment goes far beyond that standard, for it alleges with nearly excruciating particularity the averments in support of Plaintiffs' amended counts. Indeed, substantial amounts of the evidence permitting the particularity in Plaintiffs' proposed amendment came straight from the Defendants' mouths. The averments of the proposed averment will easily survive any prospective motion by Defendants for dismissal. The proposed amendment is therefore not futile.

## FURTHER JUSTIFICATION FOR THE AMENDMENT AND MERIT OF THE CLAIM ON COUNT II

35.     The fraud and concealment which surrounded the toric lens rotations also must be taken into consideration when judging whether the proposed amendment is timely and whether the Plaintiffs are advancing appropriate justification for presenting the Motion to Amend at this time. After all, this is a fraud case and, as is clear from Dr. Gills' deposition, the scheme described in the proposed amendment was designed to conceal the false nature of the billing. Gills purposefully selected a code that did not describe lens rotations in order to conceal his underlying fraud, *viz.*, claiming reimbursements for surgery to correct refractive errors that were treatable by the wearing of prescription eyeglasses. Given Gills' efforts to conceal the scheme, it should surprise no one that it took substantial time and effort to expose it. Indeed, the Defendant's attempt to conceal the fraud has proceeded full bore throughout the discovery phase of this case.

36.     The materials advanced in support of Defendants' motion for summary judgment

illustrate the Defendants' ongoing effort to conceal the truth.  Defendants have

submitted a declaration from Kevin Corcoran which avoids entirely the question

of Gills' fraud, and instead posits a semantic justification for Gills' use of CPT

code 66825: that the term "repositioning" includes the concept of "rotation."

(Corcoran Declaration, Exhibit 13, Motion of Defendants for Summary

Judgment)(Doc. 165-13).  Surely, Corcoran knows that this is an evasion on his

part, given the simple truth that he has previously acknowledged (albeit outside

of court), namely, that ***Medicare does not pay for refractive surgery***:

> For patients with operable cataracts and astigmatism, combing cataract extraction with an IOL implant and the surgical correction of astigmatism can reduce or eliminate their reliance on postoperative corrective lenses. *Medicare reimbursement is limited to services deemed medically necessary.  It does not pay for cosmetic or refractive surgery except in rare instances when refractive surgery may be covered to correct a surgical complication (Medicare Claims Processing Manual, Chapter 12, §40.1B) or treat the resulting refractive error due to trauma (Transmittal 99).  Refractive surgery performed solely to reduce the patient's dependence on eyeglasses or contact lenses would be considered cosmetic under Medicare and therefore excluded from coverage.*

**(Exhibit 8)**(emphasis added).  Corcoran has also previously written that

"Medicare claims for refractive surgery to correct preexisting astigmatism will be

denied as non-covered services in keeping with NCD [National Coverage

Determination]  § 80.7."  **(Exhibit 9)**.  Moreover, in an April 2010 presentation

before the Outpatient Ophthalmic Surgery Society, Corcoran advised his

audience that "IOL rotation due to refractive error" is a "[n]on-covered service

related to premium IOLs".[10] Thus, in this case Corcoran's attempts to exonerate Gills rest not only on his avoidance of Gills' purpose in performing lens rotations, but on Corcoran's disavowal of his own prior statements.

37.     A defendant's studious attempt to conceal and perpetuate fraudulent activity—to the point of employing rhetorical sleights and devices in advancement of a summary judgment motion—must necessarily be counterbalanced by the recognition that a plaintiff will require time and latitude to fully frame the false claims theory.  The Plaintiffs are not in control of Defendants' penchant for concealment, evasion, and semantic posturing, yet must slice through these transparent machinations in order to expose the heart of the fraud.  Plaintiffs have now done that, and seek to amend their complaint so that Gills will not be able to continue to present false bills to the Untied States of America.

38.     By virtue of the evidence revealed during discovery, it is certain that Gills has billed Medicare for thousands of instances in which his only purpose was to correcting preexisting astigmatism through rotation of a toric IOL.   While Gills has admitted in his deposition that he rotates toric lenses post-operatively in 20%-25% of his implant cases, the actual rate is at least double that. While Gills billed Medicare $784.00 for Armfield's lens rotation procedure, he has claimed reimbursements of more than double that figure in other patient's cases.  Until his May 27, 2010 deposition, Gills had never disclosed to the Plaintiffs, nor to the

---

[10]Corcoran, Kevin, *The Most Important Reimbursement and Coding Challenges Facing ASCs*, Slide 16, available at:  http://www.ooss.org/pdf/2010daysummit_ppts/ Corcoran_Reimbursement_and_Coding_Challenges.ppt **(Exhibit 10)**.

United States, that he had routinely billed for procedures he knew Medicare would not reimburse had it been apprised of the procedures' true purpose. That it would take some time to uncover such a fraudulent scheme is not surprising. And the fact that Plaintiffs uncovered the specific fraud within four months of receiving the first batch of Defendants' discovery demonstrates beyond the Plaintiffs' diligence, and the timeliness of this motion.

**CONCLUSION**

For the foregoing reasons, the Plaintiffs request this Court grant the Motion to Amend and permit Plaintiffs to file their Third Amended Complaint.

Respectfully submitted,

_____

| | |
|---|---|
| /s/ Edward A. Olds | /s/ Richard S. Matesic |
| Edward A. Olds (admitted *pro hac vice*) | Richard S. Matesic (admitted *pro hac vice*) |
| PA ID No. 23601 | PA ID No. 72211 |
| 1007 Mount Royal Boulevard | 1007 Mount Royal Boulevard |
| Pittsburgh, PA 15223 | Pittsburgh, PA 15223 |
| 412.492.8975/412.492.8978 (fax) | 412.492.8975/412.492.8978 (fax) |
| edolds@earthlink.net | rs.matesic@verizon.net |

/s/ Timothy P. O'Brien
Timothy P. O'Brien (admitted *pro hac vice*)
PA ID No. 22104
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
412.232.4400
tpob@obrien-law.net

**RULE 3.01 CERTIFICATION**

The undersigned counsel hereby certify that they have discussed this request

with Defendants' counsel and are authorized to represent that this Motion is opposed.


/s/ Richard S. Matesic


**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2010, I electronically filed the foregoing

**PLAINTIFFS' MOTION TO FILE A THIRD AMENDED COMPLAINT** with the Clerk of

Court using the CM/ECF system.


/s/ Richard S. Matesic