IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

UNITED STATES of AMERICA *ex rel.*
SAMUEL L. ARMFIELD, III, M.D. and
PATRICIA ARMFIELD, R.N.,
                              Plaintiffs,

CA. No. 8:07-cv-02374-JDW-TBM

v.

JAMES P. GILLS, M.D., ST. LUKE'S
CATARACT AND LASER INSTITUTE,
and ST. LUKE'S SURGICAL CENTER,
                              Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO AMEND THE
CORRECTED SECOND AMENDED COMPLAINT**

Relators' 11th hour Motion to Amend the complaint for a third time at the end of

discovery fails every test under which such motions are measured: it is an overly delayed,

prejudicial, futile request to present non-viable claims. *Maynard v. Bd. of Regents of the Div.*

*of the Univs. of Fla. Dep. of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003). Motions to amend

at this late stage are disfavored. (Doc. 112 ¶ 4; *see also* Local Rule 3.05(c)(2)(E) ("[a]

motion to amend any pleading . . . is distinctly disfavored after the entry of the Case

Management and Scheduling Order.").) Relators' Motion illustrates the wisdom of this

posture.[1]

Discovery in this case is virtually complete. Expert reports have been served.

Rebuttal reports are due July 20th. Discovery concludes on August 23rd. Mediation must be

completed by September 6th. Defendants' summary judgment motion, which would dispose

of this entire case, has been pending for five weeks. Relators' deadline to oppose that motion

---

[1] The extensive nature of Relators' proposed changes is revealed by comparing the Corrected Second Amended
Complaint (Doc. 114) and the proposed Third Amended Complaint (Doc. 184-1 to 184-2). *See* Ex. 1.

expired on June 18th, although in keeping with their pattern of delay, Relators filed a late motion for more time to respond.

Relators' Motion seeks to inject entirely new theories into this case, detailed below, which will prompt significant new expert testimony, voluminous new discovery, and substantial additional delay, not to mention new summary judgment motions. Yet, Relators assert disingenuously that they merely "seek[ ] to clarify certain aspects" of previously asserted claims. (Doc 175 at 1.)[2] Their assertion that these new theories could not have been known earlier fails the straight face test. The factual predicate for Relators' new theories is the same medical record for Dr. Armfield's surgery that has been in Relators' possession for years.

Relators have already amended their complaint twice (Docs. 34 and 91), in response to each motion to dismiss (Docs. 31 and 39), and corrected it once (Doc. 114).[3] Relators' improper attempts to delay this case in hopes they might somehow stumble upon a valid False Claims Act (FCA) allegation and rescue this action from summary disposition must be stopped. Accordingly, Defendants James P. Gills, M.D. ("Dr. Gills"), St. Luke's Cataract and Laser Institute ("Institute"), and St. Luke's Surgical Center ("Surgical Center") (collectively, "Defendants") respectfully submit this opposition.[4]

---

[2] With similar insincerity, they describe the proposed amendments as "only a minor modification" and a "supplement." (Doc. 175 at 3, 20.)

[3] Relators also improperly sought to amend the complaint indirectly when opposing Defendants' motion to dismiss the Corrected Second Amended Complaint. (*See* Doc. 169.)

[4] The Proposed Amendments to Count IV were not addressed in Relators' motion, but instead were discussed in a June 21, 2010 Supplemental Response to Defendants' motion to dismiss (Doc. 122) filed under seal, to which Defendants will reply per the Court's recent approval (Doc. 192).

2

I.      **Relators Have Unduly Delayed in Moving for this Amendment.**

Dr. Armfield's surgery involved removal of a cataract-impaired lens from his right eye and insertion of a man-made prosthetic toric intraocular lens ("IOL"), which both replaced the lens and corrected for preexisting astigmatism.[5]  Dr. Armfield returned for a follow-up examination during which it was found that the IOL, although implanted where the preoperative tests had indicated it should be placed, was not performing as intended.  As a consequence, Dr. Gills rotated the lens so that it would function as intended.

Count II of the operative Corrected Second Amended Complaint alleges that billing CMS for *any* postoperative rotation of a previously implanted toric lens is improper because, according to Relators, the pertinent CPT Code[6] applies only to "repositioning" such a lens, but not to a "rotation," and any such rotation procedure was encompassed by the "global" charge for the cataract surgery.  (Doc. 114, ¶¶ 65, 81, 92-93.)  Defendants' summary judgment motion refutes this theory.  (Doc. 165 at 13-18.)

Relators now propose a new Count II, which alleges that Defendants falsely billed for rotating the IOL, and the consequent correction of Dr. Armfield's astigmatism, because according to Relators, Medicare does not pay for procedures that correct for refractive error.[7] (Doc 175 at 1-2; Doc. 184-1 at ¶¶ 71-73.)  Relators have thus shifted from alleging that the billing is false because a lens "rotation" is not a lens "repositioning" to instead claim that it was false to bill for rotating the IOL to its correct position so that it treats the astigmatism as

---

[5] Astigmatism is out-of-focus vision produced by defective eye shape.  A toric IOL compensates for such defects.

[6] CPT ("Current Procedural Terminology") codes identify medical services, and are used by insurers (including Medicare) to determine reimbursement.

[7] Refractive error refers to impaired visual acuity due to a problem with the eye's ability to focus.

originally intended.  (*See* Doc. 175 at 7, n.5.)  This is entirely new legal ground, as discussed in greater detail below.  For purposes of considering delay, however, it is undeniable that the newly proposed Count II allegations all flow from Dr. Armfield's experience as a patient in April 2005.  (Doc. 184-1 ¶¶ 66-73, 83.)  The proposed amendment under these circumstances is inappropriate.  *See Senger Bros. Nursery, Inc. v. E.I. Dupont de Numours & Co.*, 184 F.R.D. 674, 679 (M.D. Fla. 1999) ("[I]it is incumbent upon the movant to show that the information upon which the new claim is based was unknown or unavailable prior to filing the motion.") (citations and quotations omitted).

Relators' insistence that the proposed Count II amendments are based on evidence only recently discovered at Dr. Gills' deposition, and could not earlier have been discovered with appropriate diligence, is belied by the facts.  (*See* Doc. 175 at 5-8, 26.)  Relators' claim is that a procedure performed on Dr. Armfield in 2005 was falsely billed.  Relators have had the records for that procedure and billing since at least 2007.  Tellingly, Relators offer the report of Dr. Alan S. Lane, whose opinion is *based entirely on the medical records of the procedure performed on Dr. Armfield.*  (Doc. 184-13 at 11-12.)  He does not even mention Dr. Gills' deposition.[8]  Nothing in Relators' Motion supports their assertion that the new theories could not have been advanced much earlier.

Similarly, Count III currently alleges that Defendants falsely billed for evaluation and management ("E&M") services related to the *right* eye IOL repositioning because that post-operative exam should have been encompassed within the "global surgical package" for the

---

[8] He does mention having looked at some other IOL repositioning operative reports, but does not mention them as a basis for his opinions.  (Doc. 184-13 at 12; Doc 175 at 17.)

cataract surgery.  (Doc. 114 at ¶¶ 96, 98, 101.)  Newly proposed Count III, in contrast, alleges that this *very same E&M service billing* was false because it was for an exam related to the decision to perform cataract surgery on Dr. Armfield's *left* eye.  (Doc. 175 at 9-11.) The basis for this new Count III is thus not, as Relators contend, facts that "have only recently been discovered."  (Doc. 175 at 13.)  Rather, once again the facts on which Relators rely come from Dr. Armfield's medical file, the same one on which Relators relied to plead the current Count III.[9]  Dr. Armfield's medical record has not changed; rather, the Relators have sought to challenge it in a different way.

Dr. Armfield's medical record reflects *two* planned actions following an examination on April 28, 2005 (the E&M billing at issue): (i) rotate the right eye (RE) lens, and (ii) schedule surgery ("SS") for the left eye.  (Doc. 165-9 at 4.)  As Relators note, Dr. Armfield underwent multiple tests during his April 28 visit.  (Doc. 184-2, ¶115.)  In the current Count III, however, Relators leapt to the conclusion that the E&M billing for that visit related to the subsequent right eye lens rotation, notwithstanding their recognition that the billing had been coded (correctly) both as unrelated to that previous right eye surgery and as representing a billing for "major surgery" the following day (*i.e.* cataract removal surgery on the left eye). (Doc. 114, ¶ 101.)[10]  Given these acknowledged representations on the face of the billing, any allegation that billing for E&M services related to the left-eye cataract surgery was false (*i.e.* the *new* Count III) should have come at the start of the case.  Instead, confronted with a

---

[9] Count III was introduced in Relators' Corrected Second Amended Complaint (Doc. 114), a new claim Relators had not even hinted at in their earlier Motion for Leave to Amend (Doc. 56).  Because it was based on Dr. Armfield's medical records, this claim should have been apparent from the outset.

[10] Relators do not consider the IOL rotation to be "major surgery."  *Id.*

summary judgment motion, Relators adopt a "well if that's not false, then how about this" approach that the Court should not permit.  The FCA "was not enacted in order to give the relator an unlimited opportunity to perfect its complaint."  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1011 (11th Cir. 2005) (citations omitted).

The proper approach is reflected in *Ducket ex rel. Calvert v. CNN*, 5:06cv444-Oc-10GRJ, 2010 WL 2025220, at *2 (M.D. Fla Apr. 19, 2010), where the plaintiff sought to amend at the end of discovery.  In that case, the plaintiffs argued that the proposed amendments were justified on new evidence received from deposition discovery, but the court noted that none of the testimony "presented factual information that plaintiffs did not -- or could not -- have access to prior to the depositions had plaintiffs exercised due diligence." *Id.*  In other words, the supposedly "new" evidence had been available since the beginning of the case.  *Id.*; *see also Maynard* 342 F.3d at 1287 ("In addition, there seems to be no good reason why Maynard could not have made the motion earlier. . . .  Because we conclude that Maynard has failed to show good cause for the eleventh hour amendment, we find that the district court did not abuse its discretion by enforcing its timetable for disposition of the case.").[11]

---

[11] Relators' reliance on *Auster Oil & Gas, Inc. v. Steam*, 764 F.2d 381 (5th Cir. 1985) and *Spartan Grain & Mill Co. v. Ayers*, 517 F.2d 214 (5th Cir. 1975) is misplaced.  In *Auster*, the  Fifth Circuit held that the district court erred by denying a motion to amend without opinion early in the case, after dismissing the initial complaint. 764 F.2d at 391.  Unlike this matter, the proposed amendments were factual and did not change the underlying legal theory, but were instead aimed at "cur[ing] pleading defects."  *Id.* at 386; *see also id.* at 391 (discussing additional allegations in proposed amendment).  The court also reversed the dismissal, rendering the motion to amend moot.  *Id.*  In *Spartan Grain*, the Fifth Circuit decided that a counterclaim amendment should have been allowed based on circumstances not present here:  the counterclaim was compulsory, no additional discovery was needed, and the district court failed to provide any reasoning for denying the amendment.  517 F.2d at 220-21.

Relators also attempt to defend their delay by claiming diligence, while mischaracterizing any delay as due to Defendants' recalcitrance. (Doc. 175 at 13, 17.) This canard does not withstand scrutiny. Relators squandered many months by repeatedly deferring deposition discovery, which *they* had initially proposed to commence in November, 2009 (9/28/09 letter (Ex. 2)), until December (10/16/09 letter (Ex. 3)), then January, and eventually into March. Relators' notices for Rule 30(b)(6) depositions, promised last October (10/23/09 letter (Ex. 4)), were not served until the very end of January 2010. Despite being served with document requests in October, 2009 (Defs. Doc. Requests (Ex. 5)), Relators did not produce any documents until February 15, 2010, with the bulk of their production coming three months later on May 15, 2010 (Email accompanying production (Ex. 6).) Relators' claim to diligence is also belied by their persistent reliance on extensions at every turn. (*See* Docs. 71, 82, 90, 129, 132, 138, 163, 174.)

Relators also blatantly distort the course of document discovery. Relators served extensive document requests on September 2, 2009, to which Defendants made timely objections on October 5, 2009. Relators did not file a motion to compel until January 4, 2010, which was deferred and ultimately *denied* without prejudice, but has never been renewed. (Doc. 81 at 2, Doc. 110 at 2.)[12] Regardless, as explained, the proposed amendments derive from Dr. Armfield's records that Relators obtained in 2007, not

---

[12] When the motion was deferred, Magistrate Judge McCoun observed that Relators' discovery was misdirected, as well as being "overly broad and, in the circumstances, unduly burdensome." (Doc. 81 at 2.) At the Magistrate's direction, a sampling of patient records was produced on February 24, 2010, so that Relators could confirm Defendants' representations that the information they purported to seek through their document requests would not be revealed by the documents requested. (Feb. 25, 2010 Hearing Tr. at 28-29 (Ex. 7).) Relators' motions to compel other written discovery were similarly deferred, denied and never renewed. (Doc. 81 at 2, Doc. 110 at 2.)

Defendants' document production last February.  Relators have chosen to spend their time on fishing expeditions and delay in hopes of finding a claim that sticks.  (*See* Doc. 181.)[13]

Relators are engaged in "sandbagging" -- choosing "to wait an artificially delayed period [to file a motion to amend], which enables [plaintiff] to benefit from discovery of issues, or a lack thereof . . . .  The defendants are, subsequently, forced to entail expenses that would never [have] arisen if plaintiff had acted in a timely fashion."  *Senger Bros. Nursery, Inc.*, 184 F.R.D. at 678.  Relators' motion to amend is also improper in that it seeks to add claims in a desperate effort to avoid summary disposition.  *Lowe's Home Ctrs., Inc. v. Olin Corp.*, 313 F.3d 1307, 1314-15 (11th Cir. 2002) (affirming denial of a motion to amend that was "designed to avoid an impending adverse summary judgment" by adding new legal theories of liability for the same facts).

## II.    Granting Leave to Amend Will Unduly Prejudice the Defendants.

Relators' dismissive contention that Defendants will suffer no prejudice from the proposed amendments is galling.  Relators repeat their false assertion that they advance no new claims. (Doc. 175 at 3, 20.)  They also argue dishonestly that the proposed amendment will "not substantially affect discovery."  (Doc. 175 at 19.)

Having withheld their newly proposed allegations until the end of discovery, although based on the very same medical records that spawned their initial complaint, Relators have placed Defendants in an untenable position.  Their highly technical arguments over Medicare regulations, billing codes and medical procedures will surely involve proposed expert witness

---

[13] In a moment of unguarded candor, Relators' counsel recently confirmed their efforts to "delv[e] deeper" in an attempt to build a case that will "survive." (June 23, 2010 Status Conf. Tr. at 22 (Ex. 8).)

testimony (or at least fights over whether they are appropriate).  Expert witness disclosures

had been due on May 24, 2010.  (Doc. 112 at 2.)  Defendants were prepared to meet that

deadline, but on the due date for disclosures Relators moved for a thirty day extension.

(Doc. 163.)  Their later request for another week to June 30 was granted.  (Doc. 187.)  In the

meantime, relying on the same medical records that started this case, Relators packaged up

their new claims (hinted at during Defendant Dr. Gills' May 27 deposition), collaborated with

their experts, and prepared their proposed amended complaint.  As the deadline for discovery

approached, Relators then served extensive new written discovery, much of it directed to the

new claims which they had not yet even sought leave to plead.[14]

   In this posture, Relators have the temerity to assert that "no substantially *new* factual

discovery will be required, nor will the Defendants be placed [in] any jeopardy of additional

litigation costs or expenses."  (Doc. 175 at 3 (emphasis added).)  This ignores, of course, the

massive factual discovery directed to their new claims that was served one business day

before their motion to amend was filed.[15]  Moreover, the new claims, if allowed to proceed,

will inject new claims *after* expert witness disclosures.  Defendants' experts have addressed

---

[14] *See* Defendants' Motion for Protective Order and Exhibits (Doc. 181.)  Service of this last-minute discovery was calculated so that responses would be due on the discovery cutoff date.  In a "first blush" assessment, the Magistrate observed that such a "last-day dump" that "could have gone out a long time ago" was "particularly onerous, costly, [and] burdensome."  (June 23, 2010 Status Conf. Tr. at 47 (Ex. 8).)

[15] For example, the new interrogatories relate entirely to the newly alleged Count II:  No. 17 asks for "each instance in which you submitted a bill under CPT code 66825 for rotation from the theoretical to the empirical axis;" No. 18 asks for "each instance in which you submitted a bill for reimbursement of service you rendered to treat iatrogenic astigmatism."  (Doc. 181-1.)  Magistrate Judge McCoun recognized the broad and overbearing reach of these inquiries, noting that "I'm not inclined to . . . put them to the task of doing that.  I mean, is that what's actually requested?  Because it seems to me that would require an enormous amount of time."  (June 23, 2010 Status Conf. Tr. at 48 (Ex. 8).)  Many requests for admission and document requests are similarly relevant only to the new claims.  (*See, e.g.*, Doc. 182-2 (RFA No. 73 (relating to E&M service billings prior to a second cataract surgery),  No. 126 (relating to Medicare reimbursement for lens adjustments)); Doc. 182-3 (Doc. Req. 46(i)(xi). (seeking documents regarding E&M services billings for patients with two cataracts), 59(f), (g), (h), and (k) (seeking documents regarding lens rotations and E&M service billings).)

the *pending* complaint and its different claims.[16]  Thus, the new claims will require reopening

the period for expert disclosures, and the Defendants' ability to develop expert analysis and

reports responsive to the new claims will have been materially prejudiced by the Relators'

late attempt to inject the new matters.[17]

As to the new claims, Relators essentially start the case over, and propose extensive

new discovery, including demands for additional medical records, additional expert and

factual deposition testimony, and other additional document production.  This is improper at

such a late stage.  *Maynard,* 342 F.3d at 1287 ("Amending Maynard's complaint on the last

day of the already extended discovery period would have produced more attempts at

discovery, delayed disposition of the case, and likely prejudiced [the defendants]").  *See also*

*Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979) (affirming denied

motion to add "an entirely new issue" after summary judgment motions had been filed);

*Ducket,* 2010 WL 2025220 ("[A]n amendment at this late stage would prejudice Defendants

by requiring them to engage in prolonged litigation."); *Sure Fill & Seal, Inc. v. GFF, Inc.*,

No. 8:08cv00882-T-17-TGW, 2009 WL 1751726, at *2 (M.D. Fla. June 17, 2009) (undue

prejudice where "amendment would delay the litigation or expand the allegations beyond the

scope of the initial complaint") (citations and quotations omitted); *Cook v. CSX Trans., Inc.*,

No. 6:06-cv-1193-Orl-19KRS, 2008 WL 2064549, at *1 (M.D. Fla. May 13, 2008) (motion

to amend late in the case denied because the methods of proof were "distinctly different" and

---

[16] Despite the already lengthy duration of this matter, Relators reportedly did not even begin working with any experts until a couple of months before the deadline for their disclosure, indicating one reason why new legal theories are popping up only now.  (June 23, 2010 Stat. Conf. Tr. at 7 (Ex. 8).)

[17] The deadline for completing discovery was also extended, but only for the duration necessary to accommodate the extended time for expert disclosures.

thus the amendment would be prejudicial); *Madura v. Countrywide Home Loans*, No. 8:06cv2073, 2008 WL 619318, at *2, 4 (M.D. Fla. March 4, 2008) (finding that motion to amend one month prior to the close of discovery would prejudice defendants "to the extent that they would not have any time to investigate the new claims"). [18]

## III.   The Proposed New Claims are Futile.

Relators' Motion to Amend must also be denied because the new allegations fail to state claims under the FCA.  "Denial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal."  *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262-63 (11th Cir. 2004) (citing *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1320 (11th Cir.1999)).

### A.   Count II

Relators seek to allege that Defendants falsely billed Medicare for repositioning IOLs inserted after cataract surgery.  According to Relators' new theory, Medicare prohibits billing for this service as not "reasonable and necessary" because that procedure corrects astigmatism. (Doc. 175 at 7, n.5.)  As with their other claims, Relators misstate the law, and do not present a valid basis for False Claims Act liability.

---

[18] Contrary to Relators' argument, neither *Gropp v. United Airlines, Inc.*, 847 F. Supp. 941 (M.D. Fla. 1994) nor *Green v. Walsh*, 21 F.R.D. 15 (E.D. Wis. 1957) present a situation similar to this matter, where the new legal theories will trigger extensive additional discovery in a compressed period of time.  In *Gropp*, the court approved the amendment because it would not result in prejudice where the issues raised had previously been raised in a "companion matter" against the same defendants, and thus would not require much additional work. *Id.* at 946.  *Green* addressed the applicability of the "relation-back" rule for amendments that fall outside of the statute of limitations, under Rule 15(c), and is not applicable to this matter.  21 F.R.D. at 19-20.  In addition, the persuasive value of this 50 year old case from a foreign jurisdiction is marginal at best.

As explained, the prosthetic IOL inserted into Dr. Armfield's eye corrects for astigmatism *by design*.  Medicare will pay to have such a lens repositioned so that it will operate as intended, and Relators have cited no authority to the contrary.

### 1.  Medicare Intends that Astigmatic-Correcting IOLs Will Be Positioned to Correct Astigmatism.

Historically, prosthetic IOLs inserted following cataract removal replaced the original lens but did not improve preexisting vision, beyond remedying the effects of the cataract.  In 1998, so-called "toric" IOLs, which also correct for astigmatism, were approved by the FDA.  Following Congressional direction, Medicare issued rules to permit additional reimbursement when such a "New Technology Intraocular Lens" ("NTIOL") was inserted following cataract removal.  65 Fed. Reg. 25738 (May 3, 2000); 64 Fed. Reg. 32189 (June 16, 1999).[19]  The purpose of this additional reimbursement was to "encourage beneficiary access to new technologies."  64 Fed. Reg. 32203.  Medicare also hoped to "encourage manufacturers to continue their IOL research and development programs" to develop more NTIOLs, including ones that would permit more patients to "forego Medicare-reimbursed post-cataract eyeglasses," an outcome Medicare considered a "benefit[] to both the beneficiary and the Medicare program."  64 Fed. Reg. 32204.

One such lens approved by CMS was the STAAR toric lens that Dr. Gills surgically inserted into Dr. Armfield's right eye.[20]  Medicare expressly approved this lens for the promotional reimbursement because it would achieve a "***Reduction in Preexisting***

---

[19] These regulations were issued by the Health Care Financing Administration (HCFS), which has since become the Center for Medicare and Medicaid Services (CMS).

[20] Compare 65 Fed. Reg. at 25740 with Ex. 9 (Excerpt from Dr. Armfield's surgical record at SLCLI 00003033), both referencing STAAR Toric Model AA4203TL.

*Astigmatism*.”  *See* 65 Fed. Reg. at 25740 (emphasis added).  Consequently, Medicare approved (*and paid extra for*) the use of this astigmatism-correcting IOL.[21]

Relators insist Medicare will not reimburse for *any* services that correct for pre-existing astigmatism and on that basis contend that Medicare will not pay for a post-surgical procedure to reposition an astigmatic-correcting lens.  Relators are obviously wrong.  Medicare paid *extra* to encourage physicians to use the astigmatic-correcting IOL, precisely in order to correct astigmatism.  The “astigmatism correction” procedure is inserting the Medicare approved and reimbursed IOL to accomplish that intended result.

A toric IOL’s position (relative to the axis of the cornea) determines the extent of its astigmatism correction.[22]  Post-operative examination may reveal, as in Dr. Armfield’s case, that the lens is not properly positioned to operate as intended, either because the lens has rotated from its initial placement or because visual acuity differs from what had been anticipated.  The diagnosis for this condition is a “mechanical complication of prosthetic ocular lens prosthesis” (2010 ICD-9-CM, Diagnosis Code 996.53 (Ex. 10) SLCLI 0000015, line 21 (Ex. 11).)   For a toric lens, correcting this complication requires that the lens be repositioned by rotating it to the correct alignment.  The CPT Code for billing this procedure is 66825: “Repositioning of intraocular lens prosthesis, requiring an incision (separate procedure).”[23]  Because the toric lens corrects astigmatism *by design*, a subsequent procedure

---

[21] Medicare’s policy to pay extra for the NTIOL toric lens Dr. Armfield received was for a five year period that expired May 18, 2005 (after his surgery).  Medicare continues to pay for inserting toric IOLs that correct astigmatism, but no longer pays the extra $50.

[22] *See* David F. Chang, *Pearls for Implanting The Staar Toric IOL*, 85 Brit. J. of Ophthalmology, 1 (2001) (Doc. 114-1, corrected Ex. 9 at 2-3)

[23] Relators in their Corrected Second Amended Complaint maintain that using this code for a lens “repositioning” is inappropriate for such a lens “rotation.” (Doc. 114 at ¶ 79.)  Defendants address this allegation in their Motion for

Footnote continued on next page

that moves it to the correct position likewise necessarily has the effect of addressing the astigmatism.  Relators confuse surgical procedures to correct refractive error from astigmatism (*i.e.* keratoplasty), which Medicare does not reimburse, with a procedure to correct a post-surgical complication with a previously inserted IOL.  In Dr. Armfield's case, the procedure that addressed his preexisting astigmatism was inserting the lens to begin with; the subsequent repositioning procedure corrected a problem with that lens.  There is no possible reason to think that Medicare expects an IOL that it *intends* to correct astigmatism would be left in the wrong position so as not to accomplish that result.

### 2.  Relators' Contention that It Is Improper to Bill Medicare to Reposition a Toric IOL is Incorrect and Unsupported.

As explained, Relators' argument that Medicare does not permit billing to reposition an out-of-position toric lens, merely because doing so will correct some astigmatism, is incorrect in light of Medicare's own statements about toric IOLs.  The authorities Relators cite do not support their contrary position.

First, Relators cite to that portion of a Medicare Manual (Doc. 184-12 at 17 (Ex. 3)) which specifically relates to denial of coverage for "refractive keratoplasty," which is surgery to reshape the cornea and correct for myopia (near-sightedness) or hyperopia (far-sightedness).  This provision says nothing whatsoever about a procedure that adjusts an out-

---

Footnote continued from previous page
Summary Judgment. (Doc. 165 at 13-15.)  Ironically, Relators now assert that articulating any difference between a "rotation" and a "repositioning" is immaterially rhetorical or semantic.  (Doc. 175 at 2.)

of-position IOL that was originally inserted, with Medicare approval and payment, to correct

for astigmatism (and perhaps to obviate the need for glasses).[24]  *Id.*

Second, Relators reference the Manual's citation to §1862(a)(7) of the Social Security

Act, which is likewise inapposite.  That provision excludes from Medicare reimbursement:

> Expenses for routine physical checkups, eyeglasses . . . or eye
> examinations for the purpose of prescribing, fitting, or changing
> eyeglasses, procedures performed (during the course of any eye
> examination) to determine the refractive state of the eyes, hearing
> aids or examinations therefore, or immunizations (except as
> otherwise allowed under section 1395x(s)(10) of this title and
> subparagraph (B), (F), (G), (H), or (K) of paragraph (1).

42 U.S.C. § 1395y(a)(7).  There is plainly no restriction on reimbursement for a procedure to

reposition an IOL so that it functions as Medicare intended.

Third, Relators quote from a January 2007 CMS Ruling (CMS 1536-R) (Doc. 184-13

at 1-9) and subsequent implementing Instructions (Transmittal 1228) (Doc. 184-17), which

address Medicare payments for IOLs inserted to correct pre-existing astigmatism.  (Doc. 175

at 7-8, n.5.)  The Ruling and Instructions do not support Relators' contentions.  Instead, they

confirm that Medicare will pay to insert *either* a conventional IOL or an IOL that corrects

astigmatism.  Moreover, the Ruling and Instruction do not address reimbursements for post-

operative correction of a malpositioned IOL, but instead are explicitly limited to

"determining payment for *insertion* of intraocular lenses. . . ."  (*Id.* (emphasis added).)  The

Instructions specifically reference the affected CPT billing codes, all of which deal with

---

[24] Relators similarly misrepresent an article by Kevin Cororan and a National Coverage Determination
regarding Medicare's position on reimbursement for refractive surgery.  (Doc. 175 at 23 (citing Doc. 184-15 at
5-51).)  Those materials address procedures to surgically correct the cornea--keratoplasty, relaxing incisions,
keratotomy--not the rotation of a previously inserted (and Medicare-covered) astigmatic-correcting IOL.

cataract removal and lens insertion. (Doc. 184-17 at 7-8.)  CPT 66825 dealing with lens

repositionings is not even mentioned.[25]

The Instructions set out Medicare's policy to not pay *more* to insert an astigmatism-

correcting IOL when the cataract is removed than it will pay when a conventional IOL is

inserted.  (Doc. 184-17 at 6.)[26]  Relators make no allegation that Defendants ever tendered to

Medicare any bill for inserting a toric IOL with charges greater than those billed when a

patient received a conventional IOL.[27]  The language from the Instructions quoted by

Relators provides that Medicare will not pay additional charges to "examine and monitor" a

patient who receives an astigmatism-correcting, rather than a conventional, IOL.  Again,

Relators do not allege that Defendants have ever billed Medicare any greater amount to

examine and monitor cataract patients based on what type of IOL they received.[28]

Relators' other claimed authority is unavailing.  They interpret a bullet-point from an

out-of-court presentation by Defendants' consultant, Kevin Corcoran, as purportedly

disavowing that "lens rotations performed to correct for refractive error are reimbursable."

(Doc. 175 at 2, 23-24.)  Yet, Relators simultaneously acknowledge that, far from advising

Defendants that the procedure is not reimbursable, Mr. Corcoran has recommended that these

---

[25] The charges that the Ruling and Instructions exclude from Medicare reimbursement relate to additional "services required to insert [the lens] or monitor a patient," such as charges for lens fitting and visual acuity testing that exceed those for a conventional IOL.  (Doc. 184-12 at 6-7.)  The Defendants charge patients separately (and not Medicare) for the additional testing associated with fitting a patient for an astigmatism-correcting IOL.  (Gills Tr. at 117:17-119:2 (Ex. 12).)

[26] *See* note 21, *supra*.

[27] The only exception would be the additional $50 that Medicare paid during the period that the lens was an approved NTIOL, which encompassed the period of Dr. Armfield's surgery.

[28] Services to "examine and monitor" a patient constitute "evaluation and management" services, which are different from the CPT 66825 lens repositioning procedure code (*see* Ex. 13), or would fall within a "global" surgical charge.

procedures be performed in a different location so that the amount of qualifying reimbursement can be increased.[29]   (Doc. 175 at 3-4.)  Likewise, the declaration from Dr. Lane says only that the toric IOL rotation corrects a refractive problem rather than a lens dislocation.  (Doc. 175 at 8-9.)  This statement merely harkens back to the Relators' earlier claim that a "rotation" cannot be a "repositioning," which even the Relators now discredit as "semantic."  (Doc. 175 at 2; *see* Doc. 165 at 14-15.)

Relators' distortions are not limited to the above misquotation of a Medicare Manual, which conflates the issue of billing for refractive surgery procedures like keratoplasty with an IOL repositioning that permits the lens to correct astigmatism *as it was designed to do.* During his deposition, Dr. Gills was initially asked about refractive surgical procedures that correct astigmatism, like keratoplasty and relaxing incisions. (Gills Tr. at 114:9-115:6 (Ex. 12).)  Relators flagrantly misrepresent this testimony as an admission that an IOL repositioning is not reimbursable. (Doc 175 at 7-8.)  In his other cited testimony, Dr. Gills did little more than acknowledge that a "toric lens is used to correct preexisting astigmatism," which, as noted above, is just what Medicare contemplates.  (Doc. 175 at 6-7 (quoting Gills Tr. at 162-63, 169-70) (*see also* Ex. 12).)[30]  Regardless, Dr. Gills' testimony does little to establish the legal viability of Relators' new claim, given that he was never qualified as an expert regarding Medicare billing requirements, and instead testified

---

[29] What Relators characterize as Dr. Gills' "taunts" may indeed reflect "his contempt for this case," but not for the law.  (Doc. 175 at 3-4.)  Dr. Gills explained that, notwithstanding his consultant's recommendation that he could collect more from Medicare by performing these procedures in the Surgical Center (and thus recover a "facility" fee), he continues to perform them elsewhere and foregoes that charge as a matter of "patient convenience." (Gills Tr. at 132:2-133:24 (Ex. 12).)

[30] The quoted language from Dr. Gills' deposition transcript at 169-70 omits a form objection at the deposition, which went uncorrected, directed at the questioner's continued confusion of "refractive surgery" (*i.e.* keratoplasty, etc.) with IOL rotations.  (Gills Tr. at 169-70 (Ex. 12).)

repeatedly that he relies on expert consultants and administrators regarding these issues.

(Gills Tr. at 117:3-118:2; 132:24-133:16; 158:2-159:4; 167:7-18; 190:24-191:6 (Ex. 12).)

### 3.   Relators' Arguments Will Not Establish that Billings for IOL Rotations Are False Claims.

As explained, it is proper to bill Medicare to correct an out-of-position astigmatism-correcting IOL. Relators' contrary position is no more than a convoluted argument regarding a possible interpretation of rules and regulations in the context of astigmatism-correcting IOLs. Notwithstanding Realtors' asserted certainty about what Medicare covers, CMS acknowledged that its Ruling and Instructions in this area was an effort to "provide clarification and interpretation of complex or ambiguous provisions of the law or regulations," yet CMS still did not address reimbursement for toric lens repositionings. (Doc. 184-13 at 1; Doc. 184-17 at 3.) Relators cannot point to any rule actually stating that the Defendants' billings for repositioning toric IOLs are false. "Claims are not 'false' under the FCA when reasonable persons can disagree regarding whether a service was properly billed to the Government." *United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007), *aff'd*, 2008 WL 3244000 (5th Cir. Aug. 7, 2008). At most, Relators' proposed Count II amendment presents a potential quarrel among "experts" and a lawyers' debate on what interpretation or policy Medicare *should* adopt; it does not present a viable FCA action.[31]

---

[31] *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir 2003) (Jones, J., concurring) ("disputed legal issues [that] arise from vague provisions" do not establish FCA liability) (citations omitted); *United States v. Whiteside*, 285 F.3d 1345, 1351-53 (11th Cir. 2002) (Medicare cost reports were not "knowingly" false where no Medicare regulation, administrative ruling, or judicial decision clearly required different calculations and "reasonable people could differ" as to the proper practice); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (explaining that "differences in interpretation growing out of a disputed legal question are . . . not false under the FCA"); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996), *cert. denied*, 519 U.S. 865 (1996) ("Even viewing [Relators'] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that

Footnote continued on next page

### B.      Count III

Relators also move to amend Count III by changing it from a purportedly false claim about E&M services related to one procedure (right eye lens rotation) to a purportedly false claim for E&M services related to something else entirely (the decision for cataract surgery on the second eye).  Relators insist that these E&M services regarding the second-eye surgery decision were "redundant" and not "medically reasonable or necessary."  (Doc. 175 at 12.)  Relators cite no Medicare regulation, manual, ruling or other authority.

Medicare unambiguously requires a patient assessment in advance of any decision to perform surgery.  42 U.S.C. § 1395y.  Consequently, Defendants routinely perform an examination following the initial cataract surgery to confirm that the patient remains an appropriate candidate for cataract surgery on the second eye.  (Gills Tr. at 190:1-191:6 (Ex. 12).)  Although diagnostic testing may have been performed for both eyes during an initial examination, in which cataracts suitable for surgical removal were evaluated, a final decision to perform cataract surgery in the second eye, and the determination of continuing medical necessity after surgery on the first eye is completed, has long been recognized as a Medicare requirement.  *See* Compliance Issues in Ophthalmology, Ch. 19 (Alan E. Reider ed., 2002) (Ex. 14).  Medicare reimbursement practices in this area, however, are neither straightforward nor uniform.  Guidance available to practitioners indicates the variations.[32]

---

Footnote continued from previous page

the allocation was *false* within the meaning of the False Claims Act."); *Luckey v. Baxter Healthcare Corp*, 2 F. Supp. 2d 1034, 1049 (N.D. Ill 1998) ("[A]mbiguous statutory requirements, where no regulations further define those requirements, cannot hold a defendant to the government's strict interpretation, so long as defendant's interpretation was reasonable.").

[32] *See* "Plan Coding for Cataract Evaluation in Second Eye" (posted on "Supercoder.com") (Ex. 15) (explaining that "many payers" will not reimburse the preoperative exam associated with the second eye surgery, but that "[s]ome

Footnote continued on next page

In addition, Medicare reimbursement for E&M services in advance of a second eye surgery depends on coverage determinations by each local insurance carrier with which Medicare contracts.[33]  Relators' proposed Count III amendment thus seeks to inject yet another debate over vague Medicare reimbursement policies, but not a viable FCA allegation of knowingly false billing.  *See Gudur*, 512 F. Supp. 2d at 932, and cases cited above at note 31.

Respectfully submitted,

| **/s/Joseph M. Meadows** | **/s/Susan K. Spurgeon** |
|---|---|
| Mark D. Colley (admitted *pro hac vice*) | Susan K. Spurgeon |
| Alan E. Reider (admitted *pro hac vice*) | Florida Bar No. 478229 |
| Joseph M. Meadows (admitted *pro hac vice*) | Pennington, Moore, Wilkinson, |
| Arnold & Porter LLP | Bell & Dunbar, P.A. |
| 555 Twelfth Street, N.W. | 2701 N. Rocky Point Dr. |
| Washington, DC.  20004 | Suite 900 |
| Ph: (202) 942-5000 | Tampa, Florida  33607 |
| Fax: (202) 942-5999 | Ph:  (813) 639-9599 |
| Mark.Colley@aporter.com | Fax:  (813) 639-9599 |
| Alan.Reider@aporter.com | susan@Penningtonlawfirm.com |
| Joseph.Meadows@aporter.com | |

Dated:  July 8, 2010

---

Footnote continued from previous page

Medicare carriers are more generous, and say that an E/M code, usually 99213 (level-three established patient office visit), should be used prior to planned cataract surgery in the contralateral eye, when an exam (92002-92014 or 99201-99215) has already been performed prior to the first cataract extraction.  They feel that the eye codes are not suitable for the second evaluation.").  Supercoder.com is a subscription-only resource that provides news alerts, how-to articles, and online coding applications, developed by practicing medical experts, to assist Medicare coders.

[33] Relators attached to their proposed Third Amended Complaint a "Local Coverage Determination" ("LCD") by Palmetto GBA, which handles Medicare reimbursements in a number of states, but not in Florida.  (Doc. 184-11 at 5-8.)  The equivalent LCD issued by First Coast, which handles reimbursements for the Florida-based Defendants, does not similarly restrict reimbursement for E&M services related to the decision for a second eye cataract surgery.  (Ex. 16.)  Yet another carrier has instructed providers to bill E&M services relating to a second-eye cataract just as Defendants have done.  (*See* Noridian Surgery Workshop excerpts at slide 29 (Ex. 17).)  LCDs have significance where Medicare has *not* provided more definitive guidance.  *See* "Medicare Physician Guide: A Resource for Residents, Practicing Physicians, and Other Healthcare Professionals" at 59-60 (available at http://www.cms.gov/MLNProducts/downloads/physicianguide.pdf) ("To further define a [National Coverage Decision] or in the absence of a specific NCD, Medicare Contractors may develop LCDs, which are coverage decisions made at their own discretion to provide guidance to the public and the medical community within a specified geographic area."); *see also Erringer v. Thompson*, 371 F.3d 625, 628 (9th Cir. 2004) ("LCDs are used only on a contractor-wide basis and may differ between contractors in different regions of the country.").

## <u>CERTIFICATE OF SERVICE</u>

The *8th* day of July 2010, the undersigned electronically filed the forgoing with the Clerk of the Court and served all counsel of record using the CM/ECF system.

<u> s/Joseph M. Meadows            </u>
Joseph M. Meadows
Counsel for Defendants